## P. Bannon Pipe Company v. Moorman.

(Decided January 15, 1918.)

### Appeal from Jefferson Circuit Court (Common Pleas, Third Division).

1. **Master and Servant—Assumption of Risk—Safe Place to Work.—** While it is the duty of the master to furnish the servant a reasonably safe place in which to work, yet if the place is reasonably safe and becomes unsafe from the way and manner the work is performed and is incident thereto, then the risk is one which the servant assumes upon entering the employment; and if the defect is one which is plainly to be observed, or one which the plaintiff discovered and appreciated, but notwithstanding continued to work without objection, he assumed the risk and the master would not be liable for any consequent accident.

2. **Master and Servant—Negligence.—** It is the duty of the servant to see and observe that which is before his eyes, and if he fails to do this, or, having observed the defect, continues his work, any accident which he might sustain is attributable to his negligence, and for which the master is not liable.

3. **Master and Servant—Relation—Rule Governing.—** Although the master may direct the servant to do the specific thing in which he was engaged when injured, still if that thing was a part of the servant's general and regular duties which he would have to perform without specific directions, such directions, will not have the effect to modify the general rule governing the relation of master and servant.

FRED FORCHT for appellant.

S. L. TRUSTY and EDWARDS, OGDEN & PEAK for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellee and plaintiff below, Myron W. Moorman, was employed by appellant, the defendant below, P. Bannon Pipe Company, to fire and look after defendant's boilers used in operating its machinery for the manufac-

ture of sewer piping and brick, in which business it is engaged in the city of Louisville. There were a number of boilers encased in brick located in the boiler room where plaintiff worked. The brick encasement was about eight or nine feet high from the floor of the room, which was brick. Two or more windows opened into the boiler room, and there was also a skylight above which contributed to the furnishing of light in the room.

About five o'clock p. m. on June 9, 1915, plaintiff, with one Wilson, who was the chief engineer having charge of all of defendant's machinery, went to the boiler room for the purpose of draining the boilers and cleaning out the pipes, they having received notice that there was soon to be an inspection of the boilers. The machinery was shut down and had been for some little time, but with the boilers partially filled with water. No machinery of any character was in that room except the boilers. The method of draining the boilers was through a blow-off valve connected up with pipes which ran the water to a ditch or sewer on the outside of the room, but in close proximity to the point where the blow-off valve connected with the pipes, they crossed and formed a T, with an end of one of the pipes connecting with no other object, making what is called in the record a "dead end," which was stopped with a plug screwed into it, the plug having to be inserted or removed with a wrench. On the top of the boilers was a valve, the plug in which would be removed by turning a wheel connected with it. But little and sometimes no water would drain through the valves from the boiler until the valve on top of the boiler would be opened so as to let in air, enabling the water to flow. Near the wall in the boiler room there was located a ladder made of oak, about thirty inches wide and nine feet long, one end of which rested on the brick floor and the other against the top part of the brick casing enclosing one of the boilers, and this was the only means by which one could get on top of the boiler. The drainage valves as well as the dead end pipe were located near the side of the ladder and could be seen by one ascending or descending it. When plaintiff and Wilson arrived at the boiler room it was soon discovered that the water would not flow, and the latter suggested to plaintiff that he open the valve on top of the boiler, which he proceeded to do by ascending the ladder, and after accomplishing his purpose he started to descend the ladder, and, as he claims, when he put his foot upon the top step it slipped

on the floor so as to cause the top end to drop a foot or more, and plaintiff jumped to the floor, causing considerable damage to both his legs and feet. To recover damages for the injuries sustained he filed this suit, alleging that defendant was negligent in failing to furnish him a safe place in which to work and making the place unsafe by causing, permitting or suffering water to accumulate on the floor of the boiler room, and around the foot of the ladder, making the surface of the floor slick, and causing the ladder to slip and give way when plaintiff stepped upon it.

The answer traversed the allegations of the petition and contained a plea of contributory negligence and one of assumption of risk. These being denied by a reply formed the issues, and the trial resulted in a verdict and judgment in favor of plaintiff for the sum of $2,400.00, to reverse which this appeal is prosecuted by defendant.

Several complaints are found in the motion for a new trial, but the grounds for a reversal urged before us are (1) that the court erred in overruling defendant's motion for a peremptory instruction; (2) error committed by the court in refusing to set aside the impaneling of the jury and continue the case upon motion made for that purpose because of a statement made by a physician witness for plaintiff while giving his testimony to the effect that he had collected a part of his fee for services rendered to plaintiff "from the insurance company," it being insisted that this was tantamount to bringing before the jury the fact that plaintiff carried indemnity insurance.

The testimony develops substantially these additional facts: Plaintiff was 37 years of age and a man of at least ordinary intelligence. He had been at work in the particular boiler room for about nine months, and had experience at similar work under other employers. His testimony shows, and there is nothing appearing to the contrary, that he was perfectly familiar with the boiler, the pipes and all of the machinery and apparatus connected therewith. His duties were not merely to fire the boilers, but also to supply them and keep them supplied with water, and to drain them when necessary. The dead end pipe mentioned was primarily for the purpose of cleaning out scales from the pipe, and perhaps from the boiler, when such would collect, which the proof shows to have been more or less frequently, and this was accomplished by unscrewing the plug from the dead end

and inserting a rod of some kind by which the scales were loosed or removed.   This had been done by plaintiff, according to his testimony, "many times."   It is shown indisputably that when the valve on top of the boiler would be open water would run from the dead end pipe if opened, and there is no doubt but that it was from this source the water came that wet the floor on the occasion of the accident.   It seems that no one had any right to be in the boiler room or to manipulate any of the pipes or machinery except Wilson and plaintiff, and the former states positively that neither immediately before nor at the time of the accident did he open the dead end pipe, and plaintiff's testimony is to the same effect concerning himself.   However this may be, true it is that when the valve on top of the boiler was opened, water began to run from the dead end pipe, but there is no proof showing that Wilson or any person representing defendant knew it at the time.   On the contrary, the proof is that no such knowledge was possessed.   Plaintiff says in his testimony that on the day he accepted employment nine months before the accident, speaking to Wilson, the engineer, concerning the ladder, he said: "That (the ladder) would make——give a man a dirty fall if it should slip out with him."   And that Wilson said in answer: "Go ahead; as long as that floor is dry that ladder is all right—safe. Be careful if the floor is wet."   It is shown and uncontradicted that plaintiff knew as much about the surroundings as well as the danger of the defects complained of as did Wilson or any other employee of defendant.   In fact, on previous occasions he had made the floor wet by washing it off with a hose, but he says that on such occasions he did not attempt to use the ladder.   There is no complaint in the petition or in any of its amendments of any other defects or negligent act, except the one mentioned.   In fact, it is expressly stated in plaintiff's pleading that "said ladder was reasonably safe for use by the plaintiff and for such use as he was making of it at the time of his injury so long as that portion of the floor of the boiler room upon which the ladder was sitting was not made wet and slippery," and no complaint is made of a failure to have the place properly lighted, nor could it have been made since the testimony shows that there was sufficient light and plaintiff actually saw the water around the foot of the ladder just as he attempted to step upon it.   Under these facts, we are called upon to determine the law applicable to the case.

It would be useless to encumber this opinion with authorities so numerous from this court and elsewhere showing that as an elementary proposition it is the duty of the master to furnish his servant a reasonably safe place in which to work, but the rule is equally universal that although such duty is imposed upon the master, it does not require him to be or become an insurer of the safety of the place or a guarantor of the servant against accidents. The master is only required to exercise ordinary care for the purpose of making and keeping the place reasonably safe, and this requirement is qualified by the further rule that if the servant has equal knowledge of the facts and conditions with the master of the defects and dangers therefrom and they are appreciated by him, or if they are so obvious that an ordinarily prudent person situated as the servant was would have observed and appreciated them, then the master will be relieved of liability. These rules, as well as their modifications, will be found to be discussed and applied in the following cases from this court: Lee v. C. & O. Railway Co., 18 Ky. Law Rep. 829; Williams v. L. & N. R. R. Co., 111 Ky. 822; American Tobacco Co. v. Adams, 137 Ky. 414; Inter State Coal Co. v. Deaton, 148 Ky. 160; Poynter v. Struck Co., 169 Ky. 127; Wilson v. American Bridge Co., 158 Ky. 814; Paducah Coal Co. v. Brockwell, 161 Ky. 426; and Daniels v. Houston, Stanwood & Gamble Co., *idem.* 528, and many other cases which might be cited. Without encumbering this opinion with a recitation of the facts in either of the cases referred to, we will content ourselves with a few excerpts from some of them illustrating the general principle of law as adopted and applied by this court

In the Whitson case, *supra,* it is said: ''The master's duty to furnish the carpenter a reasonably safe place to work does not require him to cover up such openings or remove such obstructions, which are necessarily incident to the work, so that the carpenter cannot fail to see them except by his own neglect. . . . The obstruction not being concealed, and the work being performed in the broad daylight, the master has a right to assume that the servant will see, and the law imposes upon the servant the duty to see, such obstructions as are open and obvious to any person making use of his eyes.''

In the Poynter case, *supra,* this court quoting from the case of Jones v. L. & N. R. R. Co., 95 Ky. 576, said: ''The master may be allowed to presume, in the absence

of some knowledge or warning to the contrary, that an adult servant has sufficient knowledge to operate simple tools and devices and to conduct and participate in simple operations without special warning or instructions." Further along in the same opinion the court quotes from the Deaton case, *supra*, thus: "While he (the servant) claims that he did not know of the dangers, there are some things that one must know. He must know those things which are right before his eyes, and which he himself admits having seen," and the court then quotes and adopts from Bailey on Master and Servant, page 826, "or which he could have seen by the exercise of ordinary care."

In the case of B. F. Avery & Sons v. Long, 32 Ky. Law Reporter 702, bearing upon the assumption of risk, this court said: "If an adult assumes risks incident to the place where he works, and does so with full knowledge of conditions, then there is no law in this state that makes the master liable for injury that befalls him on account of the conditions so assumed."

There is nothing found in the case of I. C. R. R. Co. v. Williams' Admr., 171 Ky. 594, and many other similar cases relied upon by appellee, detracting from or qualifying in the least, the doctrine of the above cases, for an examination of the cases relied upon by plaintiff will show an entirely different state of facts. In the Williams case referred to a beam upon which the servant was supposed to work and had a right to be upon had been made dangerous by sawing it practically in two without the knowledge of the servant or without his having any reason or grounds to anticipate that such an act would be done or would occur. Others of the cases which plaintiff relies upon are equally distinguishable from the facts of this case. Neither do we attach any importance to the fact that plaintiff was directed by the engineer, his superior servant, to go on top of the boiler and open the valve. This was nothing more than a part of his regular and general duties. He had done this many a time without being specifically directed, and in such cases the direction cannot be given the force to relieve the servant of his duties to exercise his senses to discover the defects the same as though no directions had been given. The giving of directions did not make it any more the duty of plaintiff to perform the act of opening the valve than if they had not been given. His general employment was a standing and continuing direction to do that and other acts necessary to perform his general duties.

Applying the facts now to the law as we have found it, we have a case where plaintiff not only could have seen the water upon the floor, but he actually did see it. If his experience and observation had not taught him that this might render the place more dangerous, he had been expressly told so at the beginning of his employment according to his own testimony. Neither do we find that the testimony shows that Wilson caused or procured the water from the dead end of the pipe to flow upon the floor. He says that he did not, and plaintiff states that he was standing in the same place when the descent from the ladder was attempted to be made that he was when plaintiff went up the ladder, which was some eight or ten feet from the dead end pipe. There was no wrench in his hands or to be found round about, and the inference is strong that plaintiff himself may have opened this pipe upon some previous occasion after the boiler had gone dead or ceased to be operated, which was several days before the accident. However this may be, we are convinced that an adult and an experienced servant may not blindly shut his eyes to that which is before him, and take the chance without incurring the penalty of losing his cause of action if injured. In other words, he may not thus relieve himself of the duty to exercise care for his own safety and cast that burden entirely upon the master.

A case very much in point is that of McDonald v. Lovell, 82 N. E. Rep. 955, which is a Massachusetts case, and in which the plaintiff, a servant, sought to recover damages from the master for injuries sustained by falling from a ladder, the foot of which slipped upon the floor. No complaint was made about the condition of the ladder or its arrangement, just as there is none here. It was in the same condition at the time of the accident that it was when plaintiff entered upon the employment, which fact plaintiff knew. It is not even shown in that case that plaintiff knew the ladder would be likely to slip in the condition it was in, and to that extent it is a stronger case for plaintiff than the instant one. The court, however, determined that the facts precluded a recovery and affirmed the directed verdict returned in favor of the defendant. The defect complained of here, according to our view, was not only an ordinary risk incident to plaintiff's work and duties, but the record discloses to our minds that he was guilty of such contributory negligence in failing to see and observe it as to deprive him of legal grounds of complaint.

Under the facts disclosed the motion for a peremptory instruction should have been sustained.

Wherefore, the judgment is reversed, with directions to proceed in accordance with this opinion.