### Royal Collieries Company v. Wells.

(Decided October 16, 1925.)

### Appeal from Johnson Circuit Court.

1. Appeal and Error—Error Assigned to Refusal to Substitute Judgment at Former Trial for Judgment Rendered Held Not Reviewable, in Absence of Bill of Exceptions at First Trial, as Presumptions are in Favor of Action Granting New Trial.—Error assigned to refusal of trial court to substitute judgment of former trial for judgment rendered, is not reviewable, in absence of bill of exceptions preserving errors at first trial, since presumptions are in favor of trial court's action in awarding new trial after first judgment.

2. Exceptions, Bill of—Order on Agreement that Transcript of Evidence of First Trial Might be Read in Evidence on Retrial Held Insufficient to Authorize Use as Bill of Exceptions.—Order, on agreement that transcript of evidence of first trial might be read in evidence on retrial, held insufficient to authorize use as bill of exceptions, in first case, of bill of evidence certified by stenographer, but not signed by judge, as required by Ky. Stats., section 4644, and which, although containing set of instructions given, does not show that others were not offered and refused, nor any order making all instructions offered, given or refused, part of record.

3. Appeal and Error—Admission of Evidence Stricken from Record Not Error.—Error in admission of evidence held corrected by striking it from record admonishing jury to disregard it.

4. Evidence—Exclusion of Testimony, as to Contents of Instrument Known to have Been Burned, Held Error.—In action against coal-mining company by employee for injuries, where defense was that employee was suffering with inflammatory rheumatism, held error to exclude testimony of physician that employee had signed application for insurance compensation, stating he had inflammatory rheumatism after showing that original application had been burned.

5. Appeal and Error—Judgment Not Reversed on Wrongful Exclusion of Testimony, in Absence of Showing what such Testimony would have Been.—Exclusion of testimony regarding statements in instrument signed by plaintiff, which was shown to have been burned, although error, held not grounds for reversal of judgment, where there was nothing in record showing what evidence would have been.

6. Master and Servant—"Ordinary Risk" Assumed but Not "Extraordinary Risk."—In industrial employments, employee assumes the "ordinary risk" inseparable from the business and not created by negligence of master, but he does not assume "extraordinary risks" created by master's negligence, unless he knows the danger, or it is so obvious that ordinarily prudent person would know and ordinarily coal miner does not assume risk of danger resulting from bad air.

7. Master and Servant—Risk from Bad Air Assumed by Miner Knowing Conditions.—In action against coal-mining company for injuries, where employee testified that air in room where he worked was bad, that he knew it and could see smoke while working, held employee had assumed the risk.

8. Master and Servant—Burden on Employee to Establish Cause of Injury.—In action against coal-mining company, where employee alleged he was injured by exposure to bad air, burden was on employee to establish facts.

9. Master and Servant—Evidence Held Insufficient to Support Recovery for Injuries from Bad Air in Mine.—In action against coal-mining company for injuries claimed to have resulted from bad air in room where employee worked, evidence held insufficient to support verdict for employee.

HOWES & HOWES for appellant.

J. F. BAILEY and Z. WELLS for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Reversing.

The appellant, Royal Collieries Company, was defendant below, and shall hereafter in this opinion be referred to as the defendant. It seeks to reverse a judg-

ment for $2,000.00 recovered against it by the appellee, who was plaintiff below, and shall hereafter be referred to as the plaintiff.

The plaintiff was a miner of six years' experience. He had worked for the defendant as a miner for about a year, and for the last few weeks of this time had been working in the room wherein he claims to have sustained injuries, for which he sued and made the recovery above noted. After the plaintiff had worked about two hours on the morning of September 17, 1924, he quit work, and brought his tools out of his room. Three workmen who saw him at the mouth of his room and talked with him, testified that when he was asked what was the matter, he said that he had a long way to walk; that he had suffered from rheumatism; that it was coming back on him, and he was going to quit and rest up a while. The plaintiff introduced as witnesses two of these men, and this conversation was brought out on their cross-examination. The next morning he called Dr. Castle, and when the doctor saw him he found he was suffering from inflammatory rheumatism, for which he treated him. Shortly after that he made a claim against a casualty company which was connected with the mine in some way, for benefit which he claims was due him for inflammatory rheumatism, and on December 14 he was paid by the casualty company $17.15, on December 21, $26.28, and $9.14 on February 3, on account of inflammatory rheumatism.

On March 20, 1915, plaintiff filed a suit against defendants, containing these allegations:

"This defendant carelessly and negligently permitted bad, impure and poisonous air to accumulate in the working place of said mine and where this plaintiff was required to and did work, and without knowledge of this plaintiff, and which air poisoned his body greatly, impaired and injured and run down health and body until he became wholly disabled. . . .

"At the point where said air was found and existed in said mine the entry or room where plaintiff was required to and did work as a coal loader was driven about two hundred feet beyond the air course or any breakthrough for the circulation of air."

This was the only negligence of which he complained, though he did attempt in his own testimony to show that a breakthrough had been obstructed which prevented the

free circulation of air into his room. Defendant in its answer denied all the affirmative allegations of the plaintiff's petition, and plead affirmatively contributory negligence, assumed risk and that the only disease with which the plaintiff was afflicted was inflammatory rheumatism, for which the defendant was in no wise responsible. This answer was controverted by reply. There have been two trials of this case. On the first trial, the jury returned a verdict for the defendant, but the court set aside the verdict and awarded plaintiff a new trial, which took place on July 21, 1920, and resulted in the verdict and judgment appealed from.

In defendant's motion and grounds for a new trial, it relied and now urges as grounds for reversal of the judgment of the lower court:

First. The refusal of the lower court to substitute the judgment rendered on the first trial of the case for the judgment appealed from. Second. Incompetent testimony introduced by plaintiff on the second trial. Third. Refusal of the trial court to admit competent testimony offered by defendant. Fourth. The verdict is excessive, appearing to have been rendered under the influence of passion and prejudice. Fifth. The verdict is not supported by sufficient evidence and is contrary to the law and the evidence. Sixth. Errors committed in instructing the jury. Seventh. Refusal of the trial court to sustain defendant's motion for a peremptory instruction made at the close of plaintiff's testimony and renewed at the close of all the testimony.

We will discuss these propositions in the order in which they were stated.

First. We cannot review the first error complained of as the errors occurring on the first trial have not been set out and preserved in any bill of exceptions of that trial, and in the absence of such a bill the presumption in favor of the correctness of the court's action in awarding a new trial must prevail. Life & Casualty Co. of Tenn. v. Hendon, 209 Ky. 771, 273 S. W. 469. There is in the record a bill of evidence heard on that trial, certified by the official stenographer, but it is not signed or approved by the judge as required by section 4644 of the statutes, and while it does contain a set of instructions, which the stenographer certifies were the instructions given, there was nothing to show that other instructions were not offered and refused. Neither was any order entered making all instructions offered, given or refused

a part of the record, and directing them to be copied into the transcript of the evidence by the stenographer. For aught we know, the plaintiff may have offered instructions which were not given by the court and the court may have believed error was committed in not. giving such instructions, and on account of that error, awarded a new trial to the plaintiff. Defendant contends that this bill of evidence heard on the former trial was, by agreement, filed as a bill of exceptions and relies on this order entered as of date July 21, 1920:

> "Came the defendant and produced and filed transcript of evidence and carbon copy thereof, on the former trial of this case and by agreement either of the parties hereto may read (on the present trial) all or any part of the testimony of any of the witnesses introduced on the former trial to have the same effect as depositions."

This order was insufficient for that purpose, and plaintiff's motion to strike this bill of evidence from the record is sustained.

Second. The evidence of the witness Vanhoose, complained of by defendant in its second ground for new trial, was, after it was admitted, stricken from the record by the court, and the jury admonished to disregard it, which corrected that error.

Third. One of the defendant's most important defenses was that the only disease with which the plaintiff was afflicted at the time he complains of was that of inflammatory rheumatism, which was in no wise caused by any act of negligence on the part of defendant. We have already said that after he quit work, he made a claim against the Consolidated Casualty Company for that disease, and had collected on his claim. The application which he made to this casualty company was claimed by defendant to have been filled out by plaintiff in his own handwriting, signed by him and sworn to before a notary public. This original application was produced on the first trial of the case, but between the time of the first and second trials this application was accidentally destroyed by fire. The plaintiff took the position that the words "inflammatory rheumatism" which appeared in that application, were not in there when he signed it. On the second trial the defendant sought to prove by Dr. Castle, who had filled out the physician's statement on this application, and who had examined the application

itself, that those words were in the application, and were in the handwriting of the plaintiff. The trial court refused to admit this testimony. This was very prejudicial to the defendant's rights, in view of the defendant's affirmative plea that inflammatory rheumatism was the only disease from which the plaintiff was suffering, and this error was aggravated by the plaintiff's attack upon the credibility of Dr. Castle as a witness, the plaintiff having testified himself that Dr. Castle had said that plaintiff was not suffering from rheumatism, and he introduced his father, mother and sister-in-law, who testified to the same thing. After it was shown that this paper had been burned, Dr. Castle or any other witness having knowledge of its contents, should have been permitted to testify relative thereto. There is in the record no avowal showing what Dr. Castle's evidence on this subject would have been, and in the absence of such avowal, this judgment would not be reversel for refusal to permit the witness to answer. The doctor may know absolutely nothing about this paper, so far as the record discloses.

The defendant's other grounds for a new trial will be considered together. The plaintiff says that there were between 75 and 90 men who worked in this mine at the time he received his injuries. Nine witnesses, other than the plaintiff who worked at the mine, and whose duties carried them into the room of the plaintiff and adjoining rooms, were introduced, and all of them testified that they never saw any evidence of bad air. Out of the entire number of men working at the mine, not a witness was found who had ever noted any bad air in the plaintiff's room, except one, and on cross-examination, he admitted that he did not even know where the plaintiff's room was. Not a witness out of all those employed, or even the plaintiff himself, ever noticed any bad air at any other point in the mine.

This court has had great difficulty in understanding the evidence. To illustrate that difficulty, we give here an extract from the evidence of one of the witnesses, in the hope that the result of this may be that attorneys practicing cases hereafter that are likely to be appealed, will endeavor to get the evidence into some more intelligible form than this:

"Here is the breakthrough. We put up the brattice here when the breakthrough is finished, that shoves the air on up in there, and past this here, and

we put another brattice here, and that shoves the air up here, and this is one here. We scatter the air here, and put a brattice here, and that air comes down the main entry on the return and it strikes this brattice and that drove the air up here to Ed Wells, and then it goes up here through here.''

Plaintiff's room was room ''A'' on the Meeks entry. This room was about twenty-five feet wide. It was parallel to the Tom Price entry, from which it was separated by a block of coal fifteen feet thick. It was also parallel to another room, twenty-five feet wide, in which Isaac Castle worked, and these two rooms were separated by fifteen feet of coal. Openings seventeen feet wide were cut in the block of coal on each side of the plaintiff's room for ventilation. These are called breakthroughs. Each minute, between fourteen thousand and seventeen thousand cubic feet of air were driven through this mine. This air traveled along the Tom Price entry until it reached the breakthrough leading from that entry into plaintiff's room, then entering plaintiff's room through that breakthrough, it traversed plaintiff's room and left it by means of the breakthrough between it and the room worked by Ike Castle. Plaintiff claims that the breakthrough between his room and the Price entry was stopped up by gob piled along that entry on the southwest side thereof, next to plaintiff's room. Of all the witnesses on both sides, the plaintiff himself is the only one who says that this breakthrough was so obstructed that the air could not pass. Many say that not only air but men could and did pass through it. If we understand the situation, this breakthrough might have been filled with concrete, and it would have made no difference in the air in plaintiff's room as the same air would continue along the Price entry to the Meeks entry and enter the plaintiff's room at the neck, traverse the room and pass out through the breakthrough between plaintiff's room and Castle's room, and from Castle's room through another breakthrough and so on until it passed out of the mine. Plaintiff's room was the first room on this current of air. No air could get to Castle's room until it had passed through plaintiff's room, and Castle testifies that the air in his room was good, and the men whose duties as coal cutters and machine runners carried them to the rooms of plaintiff and Castle, testified they always found good air in them.

All admit that it is fifty-five feet from the neck of room "A" on the Meeks entry to the breakthrough between this room and the Price entry. Plaintiff contends that this room "A" had been driven seventy feet beyond this breakthrough when he began work in it, and that he drove it quite a distance beyond that. No amount of questioning would induce him to say how far he drove this room. He said he guessed it was about twice as far from the breakthrough to him as it was from the breakthrough to the Meeks entry. The adjoining room when driven 150 feet was driven out. It is reasonable that plaintiff's room would have been driven out in the same distance, yet his figures would make his room 165 feet deep when he quit work. His room was not driven out as it was worked after plaintiff quit. His guess is apparently incorrect. Men who measured this room say the face of the coal was forty-nine feet from the breakthrough.

It was the duty of the defendant to ventilate its mine, and to keep the place where plaintiff was at work reasonably safe by keeping the bad air out of it, and ordinarily, a miner does not assume the risk of danger resulting to him from bad air, but the plaintiff says he knew the air was bad.

Defendant insists its motion for a directed verdict for it, made at the conclusion of plaintiff's evidence and at the conclusion of all the evidence, should have been sustained. In all industrial employments there are two classes of risks. (1) The ordinary risks inseparable from the business and not created by negligence of the master. (2) Those which are created by the master's negligence, or the extraordinary risks. The ordinary risks the servant assumes, but the extraordinary risks, or those created by the master's negligence, he does not assume, unless he knows of the defect and danger therefrom, or the defect and danger are so obvious that an ordinarily prudent person would, under the circumstances, have observed and appreciated them.

Southern Planing Mill v. Hebel, 167 Ky. 165, 180 S. W. 63. No recovery can be had of the master for injury resulting to a mature and experienced servant, from his deliberate and careless exposure of himself to a seen and known danger.

In quite a number of cases this court has approved the submission of the question of contributory negligence

or assumption of risk to the jury, some of which are: Low v. Clear Creek Coal Co., 140 Ky. 754, 131 S. W. 1007, 33 L. R. A. (N. S.) 656, Ann. Cas. 1912B 575, where a man was injured by slate falling from the roof, but Low had notified the company that he needed props and tested the slate before going under it.

Log Mountain Coal Co. v. Crunkleton, 160 Ky, 202, 169 S. W. 692, where Crunkleton was injured by bad air, but in that case the evidence in the record, which we have examined, showed that the place where Crunkleton was at work would clear of smoke in about an hour and was always clear of smoke the next morning.

In Thayer's Estate v. Kitchen, 145 Ky. 554, 140 S. W. 1052, Kitchen had notified the manager and the manager had assured him the air in his entry was the best air on the job.

In Jellico Coal Co. v. Adkins, 197 Ky. 684, 247 S. W. 972, the room cleared of smoke in about half a day.

In Jellico Coal Mining Co. v. Walls, 160 Ky. 730, 170 S. W. 19, there was no evidence of smoke in the room.

In this case, however, the plaintiff said the smoke had stood in his room all the time he was working there, that he realized the air was bad ever since he had been working there, because he could see smoke while he was working, and that there was smoke in his room on September 17, the last day he worked from a shot he had fired there on the 15th.

We cannot think a man of ordinary prudence would have entered and worked in that room under those conditions, so obvious is the danger.

No witness supports him in this. He is contradicted on every hand, and if what he says is accepted, it disclosed a situation known to him only, and so obviously dangerous that he should not recover for his deliberate and careless exposure of himself to it. There is no room for an honest difference of opinion among intelligent men, and the court should have directed the jury to find for the defendant. Poynter v. Alfred Struck Co., 169 Ky. 126, 183 S. W. 461; P. O'Bannon Pipe Co. v. Moorman, 178 Ky. 637, 199 S. W. 802; Interstate Coal Co. v. Molner, 150 Ky. 321, 150 S. W. 372.

Besides the negligence of the plaintiff in deliberately exposing himself to the danger which he says he saw, and which common sense suggests he must have appreciated, and thereby assumed the risk of injuring himself, there

are other reasons why this judgment cannot be sustained. The plaintiff's claim here is that he was injured and his health was impaired by exposure to bad air. The burden was on him to establish that. Dr. Castle, who treated him, says that his affliction was not a result of exposure to bad air. His brother, who is a physician, and who saw him about a week after he quit work, did not agree with Dr. Castle's diagnosis, and said that the plaintiff did not have rheumatism; but he also said that he was unable to diagnose the plaintiff's case and did not treat him. Further, the defendant denied that the air in the plaintiff's room was bad, and aside from the plaintiff's evidence, all the evidence in the case is that the air was good.

Plaintiff has a great deal to say about a breakthrough being closed, and that a breakthrough which he alleges was needed was not made; but that is immaterial to this case. The issue here is, was the air bad? If defendant in its answer had admitted the air was bad, and that it had done everything it could to better the air, then the breakthrough might have been very important. It was the defendant's duty to furnish the plaintiff good air, not breakthroughs, and if the plaintiff showed that defendant had failed to furnish good air, then its omission to furnish proper breakthroughs or any other instrumentality by which the air could have been bettered, would be very material. Upon these questions the verdict is flagrantly against the evidence. We cannot approve the instructions given. If the plaintiff had made out a case that should have been submitted to the jury an instruction similar to the instruction given in the case of Mt. Morgan Coal Co. v. Shumate, 157 Ky. 654, 163 S. W. 1099, or, better still, the instruction approved in Thayer's Estate v. Kitchen, *supra,* should have been given in lieu of instruction No. 1. Instruction "X" offered by defendant would have submitted to the jury in concrete form the defendant's contention that the plaintiff's trouble was inflammatory rheumatism and not the effects of bad air, and this should have been given in lieu of instruction No. 2.

The judgment is reversed and the cause remanded for further proceedings consistent herewith.